UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 06-CV-4671 (PJS/RLE) |
| Plaintiff, | |
| v. | ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION AND DIRECTING SALE OF BUSINESS CARD EXPERTS, INC. AND BCE, INC. |
| BUSINESS CARD EXPERTS, INC., a Minnesota corporation d/b/a BCE Media Inc.; BCE, INC., a Minnesota corporation; SCOTT R. BOARDMAN, individually and as an officer of Business Card Experts, Inc. and BCE, Inc.; and STEWART P. GRANDPRE, individually and as an officer of Business Card Experts, Inc. and BCE, Inc., | |
| Defendants. | |

Karen S. Hobbs and Tracey L. Thomas, FEDERAL TRADE COMMISSION; and Gregory G. Brooker, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Kevin J. Short, SHORT LAW FIRM, for defendant Scott R. Boardman.

Peter B. Wold and Aaron J. Morrison, PETER B. WOLD, PA, for defendant Stewart P. Grandpre.

This matter is before the Court on the motion of plaintiff Federal Trade Commission ("FTC") for a preliminary injunction. The Court granted the FTC's ex parte motion for a temporary restraining order ("TRO") on November 29, 2006. By agreement of the parties, the TRO was extended until the Court ruled on the FTC's preliminary-injunction motion.

The Court held two hearings relevant to this motion — one on February 2, and the other on March 30, 2007 — and the Court has considered the parties' briefs and other filings. Based on all of the files, records, and proceedings herein, the Court enters this memorandum opinion and order as its findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## I. BACKGROUND

### A. BCE's Fraudulent Activities

Defendants Scott Boardman and Stewart Grandpre are principals and officers of defendants Business Card Experts, Inc. and BCE Inc. (collectively "BCE"), which are both Minnesota corporations. *See* FTC Ex. 1, Jones Decl. Attachs. A, B.[1]  Before joining BCE, Boardman sold Internet-related services through a company called Network 1000.  In 2000, after the Minnesota Attorney General filed a complaint against Boardman and Network 1000 alleging fraudulent business practices, Boardman stipulated to the entry of a permanent injunction.  FTC Ex. 1, Jones Decl. Attachs. P, T, U, W, X.  A year later, Boardman joined BCE, and Boardman subsequently has concealed the fact that he is under a permanent injunction, even when legally required to disclose that fact.  *See* FTC Ex. 1, Jones Decl. Attach. E (BCE's disclosure documents, required by California law, in which defendants state that none of them, including Boardman, are subject to any currently effective injunctive order or have been found liable in any civil action alleging fraud within the previous seven years).

BCE is engaged in the business of selling business-card dealerships.  Individuals who purchased BCE dealerships gained the right to order business cards from BCE, which also runs a printing operation.  BCE sells dealerships for prices ranging from $10,000 to $25,000, FTC Ex. 15, Kartic Decl. ¶ 11, with a standard dealership generally costing $10,000, a master dealership $20,000, and a master-plus dealership $25,000, FTC Ex. 2, Vera Decl. Attach. K at 14, Attach. C

---

[1]The FTC submitted fourteen exhibits in support of its ex parte TRO motion.  These exhibits are organized into five volumes and were filed conventionally as docket no. 6.  The FTC submitted eleven additional exhibits in support of its preliminary-injunction motion.  Those exhibits are contained in a sixth volume and filed electronically as docket nos. 37-38 and 40-41.

at 14.  The difference between these dealerships is the wholesale price that BCE charges dealers for the cards; as the price of the dealership goes up, the price of each box of cards goes down. Since August 2001, approximately 1,300 individuals have purchased BCE dealerships; only about 300 of those dealers are still ordering cards from BCE.  FTC Ex. 15, Kartic Decl. ¶ 10; FTC Ex. 1, Jones Decl. ¶ 13.   The FTC estimates that BCE has grossed over $16 million from the sale of dealerships since 2001.  FTC Ex. 5, Crowley Decl. ¶ 15.

BCE solicits potential dealers in advertisements on the Internet and in newspapers and magazines.  *See, e.g.*, FTC Ex. 1, Jones Decl. Attachs. D, HH; FTC Ex. 6, Alyea Decl. ¶ 3; FTC Ex. 7, Blair Decl. ¶ 2.  To sell these dealerships, BCE claims that dealers can earn $150,000 or more per year.  *See, e.g.*, FTC Ex. 1, Jones Decl. Attachs. D, HH; FTC Ex. 7, Blair Decl. ¶ 2; FTC Ex. 11, Levy Decl. ¶ 3.  This claim is highly misleading.  No one has ever earned $150,000 per year selling business cards for BCE; indeed, with perhaps one or two exceptions, it appears that no one has even earned a *third* of the annual income that BCE promises.  BCE's widely disseminated claims that dealers can "Earn $150,000 + residuals 1st Year" is, at best, unfair and deceptive.

BCE also represents to potential dealers that, to quote one BCE sales representative, "there's no way in the world you could even lose a dime on this."  FTC Ex. 2, Vera Decl. Attach G at 6.  In a promotion started in 2004 — a promotion that BCE sales representatives describe as a "money-back guarantee,"*id.* — dealers receive 200, 400, or 500 free boxes of cards, depending on the level of dealership, FTC Ex. 2, Vera Decl. Attach. K.  The number of boxes roughly corresponds to the price of the dealership; thus, for $25,000, a dealer would get 500 free boxes, and, if the dealer sold them all at the suggested retail price of $49.95, he would earn $24,975,

thereby almost recouping his investment.  *Id.*  Touting this "money-back guarantee" is another

act of deception by BCE.  There is strong evidence that only a tiny percentage of dealers —

something in the neighborhood of three percent — have been able to recoup their initial

investment.  For example, of the approximately 962 dealers who have received free boxes since

January 2005, only 33 have sold all of them, which makes it clear that BCE offers nothing

remotely approaching a "money-back guarantee."  FTC Ex. 16, Jones Decl. ¶¶ 15-16.

When potential dealers call BCE to ask about purchasing a dealership, BCE sales

representatives give sales pitches that include outright falsehoods.  Potential dealers who ask for

references are given the names of BCE sales representatives, who dishonestly portray themselves

as independent dealers earning a living from their dealerships, often without disclosing that they

are paid by BCE to sell dealerships.  Sales representatives sometimes also tell prospective

dealers that, if they come on board with BCE, they will be the only BCE dealers in their areas,

which is usually false.  FTC Ex. 15, Kartic Decl. ¶ 27.

FTC investigator Martha Vera, posing as a potential dealer, recorded telephone calls with

various BCE personnel in May and June 2006.  During one call, BCE sales representative Scott

Haley, speaking of his own dealership, told Vera:  "[T]his is all we do.  We make over $200,000

a year net profit doing this business."  FTC Ex. 2, Vera Decl. Attach. B at 4.  That, of course,

was a lie.  Haley later claimed that he had three salespeople working for him.  FTC Ex. 2, Vera

Decl. Attach. C at 5.  That, too, was a lie; in reality, Haley has ordered only 5 boxes of cards

since November 2003.  Thorvig Aff. Attach. 1.

Haley also gave Vera a list of dealer references.  FTC Ex. 2, Vera Decl. Attach. C at 11.

Vera then called a number of these references, who were actually BCE sales representatives.  Art

Knight, a BCE representative posing as a dealer, told Vera he had four salespeople working for him.  FTC Ex. 2, Vera Decl. Attach. D at 4.  That was a lie; Knight has ordered only sixteen boxes of cards since November 2003.  Thorvig Aff. Attach. 1.  Similarly, sales representative Matt Fusco told Vera he has fifteen salespeople and earned his investment back in three to four months.  FTC Ex. 2, Vera Decl. Attach. E at 5-6, 8.  That was yet another lie; in reality, Fusco has ordered 272 boxes since November 2003, Thorvig Aff. Ex. 1, which would mean he sold less than $19,000 worth of cards in three years.[2]

### B.  The Status of BCE

On November 29, 2006, the Court granted the FTC's ex parte motion for a TRO, enjoined defendants from selling dealerships, froze defendants' assets, and appointed attorney Francis X. Hermann as the temporary receiver of BCE.  The purpose of freezing defendants' assets was to preserve a fund from which victims could be compensated.  The Court authorized the receiver to take control of the business and continue operations if, in his judgment, BCE could be run honestly and profitably.  Not surprisingly, the receiver determined that dealership sales could not be made honestly; obviously, few people are going to invest $25,000 in a dealership in return for a three percent chance of eventually getting their money back after a lot of hard work.  At the same time, the receiver concluded that the printing end of BCE's business could continue to operate, at least for a time.

Since the receiver took control of BCE, cash flow has been a continuing problem, in large part because receiver fees and expenses have been a drain on BCE's ability to be profitable.  If receiver and other unusual expenses associated with the interruption of BCE's business were set

---

[2]Fusco stated that he charged $69 per box.  FTC Ex. 2, Vera Decl. Attach. E at 5.

aside, the printing end of BCE's business would currently be operating on at least a break-even basis.  It is highly unlikely, though, that the printing side of the business can be profitable over the long run.  Most of BCE's income was from selling dealerships.  While BCE earns some income from the sale of cards, new dealers purchase the most cards, and dealer orders decrease each month as the dealerships age.  Without an influx of new dealers, BCE's printing business is not sustainable.  For this reason, the Court asked the parties to address the issue of whether to liquidate or sell BCE.

A number of dealers have contacted the receiver to express their desire that BCE remain in the printing business.  BCE has an Internet-based portal for its dealers to place orders, and dealers have found that portal to be a valuable tool.  The receiver has also found that BCE's card prices are generally competitive and that it produces a quality product.  The receiver is aware of dealers and others who are interested in purchasing BCE and running it as a printing business.

## II.  ANALYSIS

### A.  *Standard of Review*

Ordinarily, the Court must consider four factors in deciding whether to grant a preliminary injunction:  (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the harm that granting the injunction would inflict on the non-movant; (3) the probability that the movant will succeed on the merits; and (4) the public interest.  *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

In this case, however, the FTC seeks an injunction under 15 U.S.C. § 53(b), which permits the FTC to obtain preliminary injunctive relief against any person or entity that is violating or is about to violate any provision of law enforced by the FTC.  The parties agree that,

under § 53(b), irreparable harm is presumed and the Court need only consider the FTC's likelihood of success and the balance of any conflicting equities.  *See FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989).

*B.  The FTC's Likelihood of Success*

The FTC brings two misrepresentation claims under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and three misrepresentation claims under the FTC's Telemarketing Sales Rule, 16 C.F.R. Part 310, both as originally adopted and as amended effective March 31, 2003. Compl. ¶¶ 27-47.  For the purpose of the FTC's motion, the Court will consider only its Section 5(a) claims.

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce."  To establish liability under Section 5, the FTC must prove that defendants made a material misrepresentation that was likely to mislead customers acting reasonably under the circumstances.  *See FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003).  Misrepresentations about expected profits from a business or returns from an investment violate Section 5(a).  *FTC v. Kitco of Nev., Inc.*, 612 F. Supp. 1282, 1292 (D. Minn. 1985).

The record contains ample evidence that BCE made material misrepresentations that could, and did, mislead reasonable consumers.  BCE sales representatives told outright lies to the FTC investigator about their own and others' experiences as BCE dealers.  They falsely claimed to earn large incomes from selling business cards and to employ numerous people to sell business cards for them.  BCE also disseminated materially misleading advertising about the potential for huge profits and the certainty of earning back initial investments.

Boardman and Grandpre claim that they were unaware that their sales representatives were being so dishonest.  This claim is simply not credible, in light of all that is recounted above, in light of the testimony of BCE employees that defendants were made aware of numerous dealer complaints (FTC Ex. 15, Kartic Decl. ¶ 29), and in light of the fact that Boardman, already under a permanent injunction for dishonest business practices, should have been hyper-sensitive to the possibility that his employees were lying.  Moreover, Boardman and Grandpre do not dispute that they knew of and were responsible for the grossly misleading advertisements described above.  The FTC has shown an overwhelming likelihood that it will succeed on its Section 5(a) claims.

## C.  Balance of Equities

Defendants argue that, even if the FTC can show a likelihood of success, the preliminary injunction should be denied because Boardman and Grandpre are essential to the ongoing success of BCE.  According to defendants, current BCE dealers depend on Boardman's and Grandpre's experienced management.  The Court notes that defendants do not argue that the balance of the equities would favor permitting them to sell new dealerships — and, in any event, such an argument could not carry the day given the Court's conclusion that the FTC is very likely to succeed on the merits of its claims regarding those sales.  Nor does the Court credit Boardman's and Grandpre's conclusory argument that their presence is necessary for even the more limited purpose of servicing current dealers.

Defendants do not dispute that they lack sufficient assets to compensate the pool of potential victims.  It is also clear that, in its current form as a receivership, BCE has or will soon become a money-losing operation.  The status quo is therefore not sustainable.  The Court has

carefully balanced, on the one hand, Boardman's and Grandpre's legitimate interest in

maintaining BCE in its current form in case they ultimately prevail, against, on the other hand,

the interests of potential victims and active BCE dealers.  In light of the FTC's very strong

likelihood of success, the most important interest at stake is that of the potential victims.  *See*

*World Wide Factors*, 882 F.2d at 347 (the public equity of preserving effective relief should

receive greater weight than private equities).

The Court has considered the FTC's position that permitting the sale of BCE will

continue the fraud and suggest to dealers that BCE's fraudulent activities were legitimate.   But

the Court also wants to give current, active BCE dealers the opportunity to continue to use

BCE's printing services, as some of them have indicated they wish to do.  The Court agrees with

the receiver that BCE's printing business is not so intertwined with the sale of dealerships as to

preclude the sale of the printing business.

The best solution, therefore, is the solution proposed by the receiver:  to permit the sale

of BCE.  This resolution gives the dealers who wish to continue to sell cards the opportunity to

maintain the same vendor for products and services and thereby mitigate their damages.  It also

affords the receivership estate the greatest opportunity to maximize any financial recovery for

the benefit of victims and creditors.

The FTC's motion for a preliminary injunction is therefore granted, and the Court will

permit the sale of BCE as detailed in the text of its Order.  The FTC is not required to post a

bond.  Fed. R. Civ. P. 65(c) (no security required of the United States or its agencies); *see also*

15 U.S.C. § 53(b) (permitting a preliminary injunction sought by the FTC to enforce the FTC

Act to issue without a bond).

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, the Court enters the following order for a preliminary injunction, which shall remain in effect until further order of this Court.

DEFINITIONS

1. "Assets" means any legal or equitable interest in, right to, or claim to, any real and personal property, including, but not limited to, chattel, goods, instruments, equipment, fixtures, general intangibles, inventory, checks, notes, leaseholds, effects, contracts, mail or other deliveries, shares of stock, lists of consumer names, accounts, credits, premises, receivables, funds, and cash, wherever located, whether in the United States or abroad;

2. "Business venture" means any written or oral business arrangement, however denominated, which consists of the payment of any consideration for:

    a.      the right or means to offer, sell, or distribute goods or services (regardless of whether identified by a trademark, service mark, trade name, advertising, or other commercial symbol); and

    b.      more than nominal assistance to any person or entity in connection with or incident to the establishment, maintenance, or operation of a new business or the entry by an existing business into a new line or type of business;

3. "Corporate Defendants" means Business Card Experts, Inc. and BCE, Inc., and their successors, assigns, affiliates or subsidiaries;

4. "Individual Defendants" means Scott R. Boardman and Stewart P. Grandpre;

5. "Defendants" means (a) each Corporate Defendant and (b) each Individual Defendant;

6. "Document" is synonymous in meaning and equal in scope to the usage of the term in Federal Rule of Civil Procedure 34(a), and includes writings, drawings, graphs, charts, photographs, audio and video recordings, computer records, and other data compilations from which information can be obtained and translated, if necessary, through detection devices into reasonably usable form.  A draft or non-identical copy is a separate document within the meaning of the term;

7. "Receiver" shall mean the receiver appointed in Section IX of this Order and any deputy receivers that may be named by the receiver;

8. "Receivership Defendants" shall mean the Corporate Defendants;

9. "Representatives" means any of the Defendants' officers, agents, servants, employees, or attorneys, and those persons or entities in active concert or participation with any of the Defendants who receives actual notice of this Order by personal service or otherwise.

I.  BAN AGAINST ANY INVOLVEMENT WITH BUSINESS VENTURES

IT IS HEREBY ORDERED that the Corporate Defendants and the Individual Defendants, whether acting directly or through any corporation, limited liability company, subsidiary, division, or other device, are hereby enjoined from:

A.      Advertising, marketing, promoting, offering for sale, or selling any business venture; and

B.      Receiving any remuneration of any kind whatsoever from, holding any ownership interest, share, or stock in, or serving as an employee, officer, director, trustee, general manager of, or consultant or advisor to, any business entity engaged in or assisting in the advertising, marketing, promoting, offering for sale, or sale of any business venture.

-11-

## II.  ASSET FREEZE

IT IS FURTHER ORDERED that Defendants and their Representatives are hereby enjoined from:

A.      Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any funds, real or personal property, accounts, contracts, consumer lists, shares of stock, or other assets, or any interest therein, wherever located, whether within the United States or within a jurisdiction outside the United States, that are:  (1) owned or controlled by any of the Corporate Defendants or Individual Defendants, in whole or in part, (2) held for the benefit of any Corporate Defendant or Individual Defendant;  (3) in the actual or constructive possession of any Corporate Defendant or Individual Defendant; or (4) owned, controlled by, or in the actual or constructive possession of any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Corporate Defendant or Individual Defendant, including, but not limited to, any assets held by or for, or subject to access by, any of the Corporate Defendants or Individual Defendants, at any bank or savings and loan institution, or with any broker-dealer, escrow agent, title company, commodity trading company, precious metals dealer, or other financial institution or depository of any kind;

B.      Opening or causing to be opened any safe deposit boxes titled in the name of any Corporate Defendant or Individual Defendant, or subject to access by any of them;

C.      Incurring charges or cash advances on any credit card issued in the name, singly or jointly, of any Corporate Defendant;

D.      Obtaining a personal or secured loan encumbering the assets of any Corporate Defendant or Individual Defendant; and

E.      Incurring liens or other encumbrances on real property, personal property or other assets titled in the name, singly or jointly, of any Corporate Defendant or Individual Defendant.

The assets affected by this Section shall include:  (1) all assets of any of the Corporate Defendants or Individual Defendants as of the time this Order was entered; and (2) assets obtained after the time this Order was entered if the assets are derived from the conduct alleged in the Commission's Complaint.

III.  RETENTION OF ASSETS AND RECORDS BY FINANCIAL INSTITUTIONS

IT IS FURTHER ORDERED that any financial or brokerage institution, business entity, or person served with a copy of this Order that holds, controls or maintains custody of any account or asset of any Corporate Defendant or Individual Defendant shall:

A.      Hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, encumbrance, disbursement, dissipation, conversion, sale, or other disposal of any such asset, except by further order of the Court;

B.      Deny Defendants and their Representatives access to any safe deposit box that is titled in the name, individually or jointly or otherwise subject to access by any Corporate Defendant or Individual Defendant;

C.      Provide the Commission's counsel, within five (5) business days of receiving a copy of this Order, a sworn statement setting forth:

1.     the identification number of each such account or asset titled in the name, individually or jointly, of any Corporate Defendant or Individual Defendant, or held on behalf of, or for the benefit of, any Corporate Defendant or Individual Defendant;

2.     the balance of each such account, or a description of the nature and value of such asset, as of the close of business on the day on which this Order is served, and, if the account or other asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other asset was remitted; and

3.     the identification of any safe deposit box that is titled in the name, individually or jointly, of any Corporate Defendant or Individual Defendant, or is otherwise subject to access by any Corporate Defendant or Individual Defendant;

D.     Upon request by the Commission, promptly provide the Commission with copies of all records or other documentation pertaining to each such account or asset, including but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs; and

E.     Cooperate with all reasonable requests of the Receiver relating to the implementation of this Order, including transferring funds to the Receiver.

## IV.  PRESERVATION OF RECORDS

IT IS FURTHER ORDERED that Defendants are hereby restrained and enjoined from:

A.     Destroying, erasing, mutilating, concealing, altering, transferring or otherwise disposing of, in any manner, directly or indirectly, any documents that relate to the business,

business practices, assets, or business or personal finances of any Corporate Defendant, or

Individual Defendant, and

       B.      Failing to create and maintain documents that, in reasonable detail, accurately,

fairly, and completely reflect Defendants' incomes, disbursements, transactions, and use of

money.

## V.  FINANCIAL DISCLOSURES

       IT IS FURTHER ORDERED that each Corporate Defendant and Individual Defendant,

within fifteen (15) business days of the entry of this Order, must prepare and deliver to counsel

for the Commission and to the Receiver completed financial statements on the forms attached to

this Order as Attachment A (Financial Statement of Individual Defendant) for themselves

individually, and Attachment B (Financial Statement of Corporate Defendant) for each business

entity under which they conduct business or of which they are an officer, and for each trust for

which any Corporate Defendant or Individual Defendant is a trustee.  The financial statements

shall be accurate as of the date of this Order.  Each Corporate Defendant and Individual

Defendant shall include in the financial statements a full accounting of all funds and assets,

whether located inside or outside of the United States, that are:  (A) titled in the name of such

Corporate Defendant or Individual Defendant, jointly, severally or individually; (B) held by any

person or entity for the benefit of such Corporate Defendant or Individual Defendant; or

(C) under the direct or indirect control of such Corporate Defendant or Individual Defendant.

## VI. CONSUMER CREDIT REPORTS

IT IS FURTHER ORDERED that, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(a)(1), any consumer reporting agency may furnish a consumer report concerning any Corporate Defendant or Individual Defendant to the Commission.

## VII. FOREIGN ASSET REPATRIATION

IT IS FURTHER ORDERED that within fifteen (15) business days following the service of this Order, each Corporate Defendant and Individual Defendant shall, to the extent that it or he has not already done so:

A.      Provide the Commission and the Receiver with a full accounting of all funds, documents, and assets outside of the United States which are:  (1) titled in the name, individually or jointly, of any Corporate Defendant or Individual Defendant; or (2) held by any person or entity for the benefit of any Corporate Defendant or Individual Defendant; or (3) under the direct or indirect control, whether jointly or singly, of any Corporate Defendant or Individual Defendant;

B.      Transfer to the territory of the United States and deliver to the Receiver all funds, documents, and assets located in foreign countries which are:  (1) titled in the name individually or jointly of any Corporate Defendant or Individual Defendant; or (2) held by any person or entity, for the benefit of any Corporate Defendant or Individual Defendant; or (3) under any Corporate Defendant or Individual Defendant's direct or indirect control, whether jointly or singly.

## VIII.   INTERFERENCE WITH REPATRIATION

IT IS FURTHER ORDERED that the Defendants and their Representatives are hereby restrained and enjoined from taking any action, directly or indirectly, which may result in the encumbrance or dissipation of foreign assets, or in the hindrance of the repatriation required by Section VII of this Order, including but not limited to:

A.      Sending any statement, letter, fax, e-mail or wire transmission, telephoning or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time that all assets have been fully repatriated pursuant to Section VII of this Order;

B.      Notifying any trustee, protector or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to a Court Order, until such time that all assets have been fully repatriated pursuant to Section VII of this Order.

## IX.  APPOINTMENT OF RECEIVER

IT IS FURTHER ORDERED that Francis X. Hermann is appointed as Receiver for the Receivership Defendants.  The Receiver shall be the agent of this Court, and solely the agent of this Court, in acting as Receiver under this Order.  The Receiver shall be accountable directly to this Court.

## X.  RECEIVER'S DUTIES

IT IS FURTHER ORDERED that the Receiver is authorized and directed to accomplish the following:

A.      Suspend business operations of the Receivership Defendants, vacate the business premises occupied by the Receivership Defendants, and consolidate all records and other assets by moving assets and records currently located outside of this District to a secure facility maintained within this District;

B.      Assume full control of the Receivership Defendants by removing, as the Receiver deems necessary or advisable, any director, officer, independent contractor, employee, or agent of any of the Receivership Defendants, including any Defendant, from control of, management of, or participation in, the affairs of the Receivership Defendants;

C.      Take exclusive custody, control, and possession of all assets and documents of, or in the possession, custody, or under the control of, the Receivership Defendants, wherever situated.  The Receiver shall have full power to divert mail and to sue for, collect, receive, take in possession, hold, and manage all assets and documents of the Receivership Defendants and other persons or entities whose interests are now under the direction, possession, custody, or control of, the Receivership Defendants.  The Receiver shall assume control over the income and profits therefrom and all sums of money now or hereafter due or owing to the Receivership Defendants.  Provided, however, that the Receiver shall not attempt to collect any amount from a consumer if the Receiver believes the consumer was a victim of the unfair or deceptive acts or practices or other violations of law alleged in the Complaint in this matter, without prior Court approval;

D.      Take all steps necessary to secure each location from which the Receivership Defendants operate their business.  Such steps may include, but are not limited to, any of the following, as the Receiver deems necessary or advisable:  (1) serving this Order; (2) completing

a written inventory of all receivership assets; (3) obtaining pertinent information from all employees and other agents of the Receivership Defendants, including, but not limited to, the name, home address, social security number, job description, passwords or access codes, method of compensation, and all accrued and unpaid commissions and compensation of each such employee or agent; (4) photographing and video taping any or all portions of the location; (5) securing the location by changing the locks and disconnecting any computer modems or other means of access to the computer or other records maintained at that location; and (6) requiring any persons present on the premises at the time this Order is served to leave the premises, to provide the Receiver with proof of identification, or to demonstrate to the satisfaction of the Receiver that such persons are not removing from the premises documents or assets of the Receivership Defendants.  Law enforcement personnel, including, but not limited to, police or sheriffs, may assist the Receiver in implementing these provisions in order to keep the peace and maintain security.  If requested by the Receiver, the United States Marshal will provide appropriate and necessary assistance to the Receiver to implement this Order;

   E.  Conserve, hold, and manage all assets of the Receivership Defendants, and perform all acts necessary or advisable to preserve the value of those assets in order to prevent any irreparable loss, damage, or injury to consumers or creditors of the Receivership Defendants, including, but not limited to, obtaining an accounting of the assets and preventing the unauthorized transfer, withdrawal, or misapplication of assets;

   F.  Enter into contracts and purchase insurance as advisable or necessary;

G.      Prevent the inequitable distribution of assets and determine, adjust, and protect the interests of consumers and creditors who have transacted business with the Receivership Defendants;

H.      Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

I.      Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order. The Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the Receivership Defendants prior to the date of entry of this Order, except payments that the Receiver deems necessary or advisable to secure assets of the Receivership Defendants, such as rental payments;

J.      Institute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal or foreign courts or arbitration proceedings as the Receiver deems necessary and advisable to preserve or recover the assets of the Receivership Defendants, or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order, including but not limited to, actions challenging fraudulent or voidable transfers;

K.      Defend, compromise, adjust, or otherwise dispose of any or all actions or proceedings instituted in the past or in the future against the Receiver in his role as Receiver, or against the Receivership Defendants, as the Receiver deems necessary and advisable to preserve

the assets of the Receivership Defendants, or as the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

      L.      Issue subpoenas to obtain documents and records pertaining to the Receivership, and conduct discovery in this action on behalf of the receivership estate;

      M.      Open one or more bank accounts as designated depositories for funds of the Receivership Defendants.  The Receiver shall deposit all funds of the Receivership Defendants in such a designated account and shall make all payments and disbursements from the receivership estate from such an account.  The Receiver shall serve copies of monthly account statements on all parties;

      N.      Maintain accurate records of all receipts and expenditures that he makes as Receiver;

      O.      Cooperate with reasonable requests for information or assistance from any state or federal law enforcement agency;

      P.      Make periodic reports, observations, and recommendations to this Court, and seek guidance and instructions from this Court, if the Receiver deems it necessary.  Such reports may include the following information regarding the Corporate Defendants:  (1) a description of the business and of the Individual Defendants' roles in the business; (2) an enumeration and/or detailed description of revenues and expenditures; (3) identification of earnings claims made in the course of offering for sale of Defendants' business ventures; (4) any substantiation for such earnings claims; (5) the number of purchasers of Defendants' business ventures, and the amount they paid for Defendants' business ventures; and (6) any additional information that the Receiver deems useful to the Court.

IT IS FURTHER ORDERED that the Receiver shall make a good faith effort to proceed with the sale of the assets and going concern value of the Receivership Defendants upon the following terms and conditions:

Q.      The Receiver shall develop a list of all individuals who have purchased dealerships from the Receivership Defendants ("dealers").  The Receiver shall develop a separate list of dealers who have placed an order for cards with the Receivership Defendants during the period October 1, 2006 to the present ("current dealers");

R.      The Receiver is not authorized to sell the list of dealers.  He is authorized to include in a sale the list of current dealers, subject to the limitations set forth below;

S.      After the sale, the Receiver shall notify the dealers that the assets of the Receivership Defendants have been sold and that their contracts with the Receivership Defendants are canceled.  The Receiver shall also notify the dealers that the purchaser of the Receivership Defendants is willing to continue the services provided by the Receivership Defendants in the past.  The dealers must be notified that they have no obligation to do business with the purchaser, but they may do so if they wish;

T.      The new owner may e-mail or send a letter to the current dealers, introducing himself and giving a description of the goods and services he will provide, and the cost of those goods and services.  The purchaser shall make no further use of the current dealer list except for the introductory communication and one follow-up communication setting forth his practice and pricing schedule.  At that time he shall return the current dealer list to the Receiver, and he shall not keep any copy of the current dealer list;

U.      The new owner shall not sell dealerships in any form;

V.      The Receiver shall liquidate and dissolve the Receivership Defendants after the sale;

W.      The Receiver shall make a reasonable effort to locate any and all copies of the dealer list and obtain the return of said list(s);

X.      In the event the Receiver is unable to sell the assets and going concern of the Receivership Defendants with the preceding terms and conditions included, he shall return to the Court for permission to sell the assets of the Receivership Defendants (not including the dealer and current dealer lists) and liquidate the corporation.

## XI.  TRANSFER OF RECEIVERSHIP PROPERTY TO RECEIVER

IT IS FURTHER ORDERED that Defendants and any other person or entity with possession, custody or control of property of or records relating to the Receivership Defendants shall upon notice of this order by personal service or otherwise immediately notify the Receiver of, and, upon receiving a request from the Receiver, immediately transfer or deliver to the Receiver possession, custody, and control of, the following:

A.      All assets of the Receivership Defendants;

B.      All documents of the Receivership Defendants, including, but not limited to, books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), client lists, title documents and other papers;

C.      All computers and data in whatever form used to conduct the business of the Receivership Defendants;

D.      All assets belonging to other persons or entities whose interests are now under the direction, possession, custody, or control of, the Receivership Defendants; and

E.      All keys, codes, and passwords necessary to gain or to secure access to any assets or documents of the Receivership Defendants, including, but not limited to, access to their business premises, means of communication, accounts, computer systems, or other property. In the event that any person or entity fails to deliver or transfer any asset or otherwise fails to comply with any provision of this Section, the Receiver may file ex parte an Affidavit of Non-Compliance regarding the failure.  Upon filing of the affidavit, the Court may authorize, without additional process or demand, Writs of Possession or Sequestration or other equitable writs requested by the Receiver.  The writs shall authorize and direct the United States Marshal or any sheriff or deputy sheriff of any county, or any other federal or state law enforcement officer, to seize the asset, document, or other item covered by this Section and to deliver it to the Receiver.

## XII.  PROVISION OF INFORMATION TO RECEIVER

IT IS FURTHER ORDERED that Defendants shall provide to the Receiver, immediately upon request, the following:

A.      A list of all assets and property, including accounts, of the Receivership Defendants that are held in any name other than the name of a Receivership Defendant, or by any person or entity other than a Receivership Defendant; and

B.      A list of all agents, employees, officers, servants or those persons in active concert and participation with the Individual Defendants and Receivership Defendants, who have been associated or done business with the Receivership Defendants.

## XIII.  COOPERATION WITH THE RECEIVER

IT IS FURTHER ORDERED that Defendants and all other persons or entities served with a copy of this Order shall fully cooperate with and assist the Receiver in taking and maintaining possession, custody, or control of the assets of the Receivership Defendants.  This cooperation and assistance shall include, but not be limited to:  providing information to the Receiver that the Receiver deems necessary in order to exercise the authority and discharge the responsibilities of the Receiver under this Order; providing any password required to access any computer, electronic file, or telephonic data in any medium; and advising all persons who owe money to the Receivership Defendants that all debts should be paid directly to the Receiver; transferring funds at the Receiver's direction; and producing records related to the assets and sales of the Receivership Defendants.  The entities obligated to cooperate with the Receiver under this provision include, but are not limited to, banks, broker-dealers, savings and loans, escrow agents, title companies, commodity trading companies, precious metals dealers and other financial institutions and depositories of any kind, and all third-party billing agents, common carriers, and other telecommunications companies, that have transacted business with the Receivership Defendants.

## XIV.  INTERFERENCE WITH THE RECEIVER

IT IS FURTHER ORDERED that Defendants and their Representatives are hereby restrained and enjoined from directly or indirectly:

A.      Interfering with the Receiver managing, or taking custody, control, or possession of, the assets or documents subject to this receivership;

B.      Transacting any of the business of the Receivership Defendants, except with the express permission of the Receiver;

C.      Transferring, receiving, altering, selling, encumbering, pledging, assigning, liquidating, or otherwise disposing of any assets owned, controlled, or in the possession or custody of, or in which an interest is held or claimed by, the Receivership Defendants, or the Receiver; and

D.      Refusing to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their duties or authority under any order of this Court.

### XV.  STAY OF ACTIONS AGAINST RECEIVERSHIP DEFENDANTS

IT IS FURTHER ORDERED that, except by leave of this Court, during the pendency of the receivership ordered herein, Defendants, and all investors, creditors, stockholders, lessors, customers and other persons seeking to establish or enforce any claim, right, or interest against or on behalf of Defendants, and all others acting for or on behalf of such persons, are hereby enjoined from taking action that would interfere with the exclusive jurisdiction of this Court over the assets or documents of the Receivership Defendants, including, but not limited to:

A.      Petitioning, or assisting in the filing of a petition, that would cause any Receivership Defendant to be placed in bankruptcy;

B.      Commencing, prosecuting, or continuing a judicial, administrative, or other action or proceeding against the Receivership Defendants, including the issuance or employment of process against the Receivership Defendants, except that such actions may be commenced if necessary to toll any applicable statute of limitations;

C.      Filing or enforcing any lien on any asset of the Receivership Defendants, taking

or attempting to take possession, custody, or control of any asset of the Receivership Defendants;

or attempting to foreclose, forfeit, alter, or terminate any interest in any asset of the Receivership

Defendants, whether such acts are part of a judicial proceeding, are acts of self-help, or

otherwise;

D.      Initiating any other process or proceeding that would interfere with the Receiver

managing or taking custody, control, or possession of, the assets or documents subject to this

receivership.

Provided that, this Order does not stay:  (1) the commencement or continuation of a

criminal action or proceeding; (2) the commencement or continuation of an action or proceeding

by a governmental unit to enforce such governmental unit's police or regulatory power; or

(3) the enforcement of a judgment, other than a money judgment, obtained in an action or

proceeding by a governmental unit to enforce such governmental unit's police or regulatory

power.

## XVI.  COMPENSATION OF RECEIVER

IT IS FURTHER ORDERED that the Receiver and all personnel hired by the Receiver as

herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable

compensation for the performance of duties pursuant to this Order and for the cost of actual

out-of-pocket expenses incurred by them, from the assets now held by, in the possession or

control of, or which may be received by, the Receivership Defendants.  The Receiver shall file

with the Court and serve on the parties periodic requests for the payment of such reasonable

compensation, with the first such request filed no more than sixty (60) days after the date of

entry of this Order.  The Receiver shall not increase the hourly rates used as the bases for such

fee applications without prior approval of the Court.

## XVII.  RECEIVER'S BOND

IT IS FURTHER ORDERED that the Receiver shall maintain with the Clerk of this

Court a bond in the sum of $25,000 with sureties to be approved by the Court, conditioned that

the Receiver will well and truly perform the duties of the office and abide by and perform all acts

the Court directs.

## XVIII.  ACCESS TO BUSINESS OFFICES AND RECORDS

IT IS FURTHER ORDERED that the Receiver and the Defendants shall allow

representatives of the Commission reasonable access to all premises where the Defendants are

conducting or have conducted business and to all premises where any of the Defendants'

business records may be located, so that the representatives of the Commission may inspect all

documents of the Defendants and may copy such documents either on or off the premises.

Furthermore, the Receiver shall allow the Defendants reasonable access to the business

records of the Receivership Defendants within his possession for the purpose of inspecting and

copying materials relevant to this action.  The Receiver shall have the discretion to determine the

time, manner, and reasonable conditions of such access.

## XIX.  EXPEDITED DISCOVERY

IT IS FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 26(b),

discovery may commence at any time after the entry of this Order, consistent with any

scheduling orders issued by this Court.

## XX.  SERVICE BY FACSIMILE AUTHORIZED

IT IS FURTHER ORDERED that copies of this Order may be served by any means, including facsimile transmission, upon any financial institution or other entity or person that may have possession, custody, or control of any documents or assets of any Corporate Defendant or Individual Defendant, or that may otherwise be subject to any provision of this Order.  Service upon any branch or office of any financial institution shall effect service upon the entire financial institution.

## XXI.  DEFENDANTS' DUTY TO DISTRIBUTE ORDER

IT IS FURTHER ORDERED that the Corporate Defendants and Individual Defendants shall immediately provide a copy of this Order to each of their affiliates, subsidiaries, divisions, sales entities, successors, assigns, officers, directors, employees, independent contractors, client companies, agents, attorneys, spouses and representatives, and shall, within ten (10) days from the date of entry of this Order, provide the Commission with a sworn statement that: (A) confirms that Defendants have provided copies of the Order as required by this paragraph; and (B) lists the names and addresses of each entity or person to whom Defendants provided a copy of the Order.  Furthermore, the Corporate Defendants and Individual Defendants shall not take any action that would encourage officers, agents, directors, employees, salespersons, independent contractors, attorneys, subsidiaries, affiliates, successors, assigns or other persons or entities in active concert or participation with Defendants to disregard this Order or believe that they are not bound by its provisions.

## XXII. COMPLIANCE MONITORING

IT IS FURTHER ORDERED that the Commission is authorized to monitor compliance with this preliminary injunction by having its investigators pose as consumers or suppliers to Defendants, or any other entity merged in whole or in part by any Defendant, without the necessity of identification or prior notice.

## XXIII. SERVICE UPON PLAINTIFF

IT IS FURTHER ORDERED that Defendants shall serve all pleadings, memoranda, correspondence, affidavits, declarations, or other documents related to this case by facsimile transmission to (202) 326-3162; by hand delivery to the offices of the Federal Trade Commission, at 600 Pennsylvania Avenue, NW, Room H-286, Washington, DC 20580, and addressed to the attention of Karen S. Hobbs; or by overnight shipment through a third-party commercial carrier for delivery at this address.

Dated: April 27, 2007         s/Patrick J. Schiltz
                                      Patrick J. Schiltz
                                      United States District Judge